**In re Janice W. HOLLINS, Debtor.**

**Bankruptcy No. 393–36484 RCM–13.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

March 8, 1995.

Carron Nicks Armstrong, Dallas, TX, for debtor.

Molly Bartholow, Trustee, Law Firm of Bartholow & Milbank, Dallas, TX.

## MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

This opinion deals with an objection by OmniAmerican Federal Credit Union ("OmniAmerican") to its treatment under the Chapter 13 plan of Debtor Janice W. Hollins ("Hollins" or "Debtor"). OmniAmerican, as an oversecured car creditor objects to being paid out under Debtor's plan on its secured claim at a rate of 6% when its contract rate is 11.5%. The only interest rate evidence in the record at confirmation was the prime rate at date of the filing of the case, and the creditor's contract rate. Hollins has the burden of proof to show compliance with § 1325(a)(5)(b) as of the effective date of the plan. Since there is insufficient evidence in the record from either side on this issue, confirmation is denied without prejudice. To assist the parties in their analysis in any further hearing, this opinion is issued. This court has jurisdiction pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

### Findings of Fact and Conclusions of Law

The foregoing and following are the Court's findings of fact and conclusions of law pursuant to Bankr.R. 7052. Section 1325(a)(5)(B)(ii) requires Debtor to pay an objecting secured creditor the value of its allowed secured claim, "as of the effective date of the plan." In other words, the present value of payments to secured creditors under the plan must at least equal their allowed secured claims as of the plan's effective date. Present value calculations require that the plan payments incorporate a discount interest rate. Hollins and OmniAmerican dispute the proper interest rate that the court should use in evaluating the payments' present value.

Hollins suggests that this court should apply the prime rate as of the case's commencement date. *Citing, In re Hudock*, 124 B.R. 532 (Bankr.N.D.Ill.1991). *Hudock* adopted the prime rate as an approximation of the creditor's borrowing rate. *Id.* at 534. According to *Hudock*, a secured creditor's compensation under § 1325 solely protects the creditor's interest in the collateral and the creditor's borrowing rate sufficiently pro-

**526**

tects that interest. *Id.* The creditor can borrow money in order to compensate for its inability to liquidate collateral on the plan date or its failure to receive up front payment for its claim. *Id.* Further, *Hudock* determined the interest rate as of the commencement of the case, rather than as of the plan's effective date. *Id.* at 534–535. The court dismissed the express language found in § 1325 for "practical problems" associated with valuation as of the plan's effective date. *Id.* at 535.

This court declines to follow *Hudock* and will apply the interest rate, as of the plan's effective date, "for a loan similar in character, amount and duration to the credit which the creditor [must] extend under the plan." *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 65 (3d Cir.1993) ("*Jones* "). Accord, 2 David G. Epstein Et Al., *Bankruptcy* § 9–10 at 641 (1992) ("*Epstein* "); *Memphis Bank & Trust v. Whitman,* 692 F.2d 427 (6th Cir.1982).

In Todd J. Zywicki, *Cramdown and the Code: Calculating Cramdown Interest Rates Under the Bankruptcy Code,* Vol. 19 THURGOOD MARSHALL L.REV. at 252 (Spring 1994), the author states: "... there seems to be no coherent policy goal for providing debtors in bankruptcy with preferential interest rates relative to solvent borrowers."

■ Section 1325 does not seek solely to protect the creditor's interest in the collateral. Section 1325 provides for the creditor to retain its lien, which protects the creditor's interest in the collateral, *and* receive the present value of the allowed amount of its claim. § 1325(a)(5)(B). Section 1325(a)(5)(B)(ii) seeks to put the secured creditor in the same economic position it would have occupied had it received the allowed secured amount as of the plan's effective date. *Jones, supra,* 999 F.2d at 66; *See*

H.R.Rep. No. 595, 95th Cong., 1st Sess. 413 (1977) (Section 1129(b) values property, "as of the effective date of the plan, thus recognizing the time-value of money.") (*See,* n. 8 hereafter).

■ The creditor's borrowing rate, *i.e.,* the rate at which the creditor borrows its funds, fails to place the creditor in as good a position as if the creditor had received its claim on the effective date. First, the rate fails to include all of the costs associated with forcing the creditor to continue a lending relationship with the debtor. *Id.* at 67–69. Second, the interest rate should incorporate opportunity costs for the creditor's inability to re-loan these funds. Although, as *Hudock* argues, the creditor may borrow funds which it may re-loan at a profit, every secured creditor has limited amounts of credit. By forcing a creditor to draw on its borrowing capacity without providing the creditor with its usual capital return, the creditor will incur a loss. *See United Carolina Bank v. Hall,* 993 F.2d 1126, 1130 (4th Cir.1993). Therefore, an interest rate should compensate a secured creditor for lost profits. *Jones, supra,* 999 F.2d at 69. "[W]hat creditor willingly reinvests its money at its own cost of funds?" *Epstein, supra,* § 9–10 at 643. Epstein further argues against considering the circumstances of a particular specific creditor and the fact that the present value of a dollar is greater to some creditors than to others. "We read section 1325 to treat the present value of a dollar as a dollar and to ignore the fact that a particular dollar might be worth only 98 cents to one party and $1.04 to another" (*Id.* at 641) because of what such creditor's own borrowing market is.

Many courts have adopted a "similar loan" rate.[1] Some courts look to the "prevailing market rate" as a subset thereof. *Memphis*

---

1. *Memphis Bank & Trust v. Whitman,* 692 F.2d 427, 431 (6th Cir.1982); *See Farm Credit Bank of Spokane v. Fowler (In re Fowler),* 903 F.2d 694, 697 (9th Cir.1990) (Adopts the market approach, but determines the market rate can also be determined by adding a market risk factor to a base rate); *Jones,* 999 F.2d at 65; *Hall,* 993 F.2d at 1130; *See also United States v. Doud,* 869 F.2d 1144, 1145–46 (8th Cir.1989) (Applying the market approach under § 1225(a)(5)(B)); *Hardzog v.*

*Fed'l Land Bank of Wichita (In re Hardzog),* 901 F.2d 858, 860 (10th Cir.1990) (Using the market rate for a chapter 12 cramdown); *United States v. Southern States Motor Inns, Inc. (In Matter of Southern States),* 709 F.2d 647, 651 (11th Cir. 1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984) (Employing the prevailing market rate for a loan of equal term and similar risks under § 1129).

*Bank & Trust Co. v. Whitman, supra,* 692 F.2d at 431; *United States v. Southern States Motor Inns, Inc. (Matter of Southern States Motor Inns, Inc.),* 709 F.2d 647, 651 (11th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). Others recommend the judicial determination of interest rates from a base rate adjusted by a risk premium. *Farm Credit Bank of Spokane v. Fowler (In re Fowler),* 903 F.2d 694, 697 (9th Cir.1990). Others argue that the rate should be tailored to the particular creditor. *Jones, supra,* 999 F.2d at 68.

■ Employing a prevailing market rate for a loan of equal term and similar risks (*United States v. Southern States Motor Inns, Inc., supra,* appears to be particularly appropriate in determinations of discount rates on motor vehicles under § 1325(a)(5)(B), since such rate is so easily obtainable.

Utilization of this method on motor vehicles avoids judicial creation of interest rates [2] and keeps confirmation costs reasonable. In most cases, the debtor and creditor should be able to stipulate to a rate based on easily obtainable vehicle loan statistics. The contract interest rate can provide a negotiation starting point. *See generally, Heartland Fed'l Savings & Loan Assoc. v. Briscoe Enterprises, Ltd. (Matter of Briscoe Enterprises, Ltd.),* 994 F.2d 1160, 1169 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993) (The Bankruptcy Court's use of the contract rate for a discount rate under § 1129(b)(2)(A)(I) was not clearly erroneous).[3]

■ Capping the interest rates at the contract rate [4] appears inappropriate because a cap conflicts with the purpose of § 1325. *Jones, supra,* 999 F.2d at 71 n. 11; *Epstein, supra,* § 9–10. "Section 1325 directs the debtor to pay the creditor 'the value,' it does not direct payment of the value 'but not more than the contract rate.'" *Epstein, supra,* § 9–10 at 644. A decrease or an increase in rates from the time of contracting will either over or under compensate the creditor for its new "loan" to the debtor. Neither will this court deduct for the bank's traditional loan-making expenses. *See, Hall,* 993 F.2d at 1131; *Epstein, supra,* § 9–10. The creditor faces additional costs in "loaning" money to the debtor and these costs would likely cancel out any "savings" the bank may realize from not creating a new loan in the marketplace. *Epstein, supra,* § 9–10 at 642. ("[N]egotiating a Chapter 13 plan with a debtor is likely to cost at least as much as making a new loan.").

■ The adoption of a "similar loan" discount rate also finds support in Fifth Circuit case law. While the Fifth Circuit has not provided the standard for arriving at an appropriate interest rate under § 1325 or similar Code provisions,[5] it has reviewed a bankruptcy court's discount rate determination under § 1129(b)(2)(A)(I). *In re Briscoe Enterprises, Ltd., supra,* 994 F.2d at 1169. The Court reviewed the bankruptcy court's rate determination for clear error. *Id.* Although *Briscoe* did not enunciate a standard, the Court did approve of using the contract rate for present value calculations. *Id.* Further, the Court found that the proper rate would

**2.** Some courts have criticized the judicial crafting of interest rates. *Hardzog, supra,* 901 F.2d at 860. A prevailing market rate provides the best evidence of the true rate at which a creditor could actually receive on a loan in the marketplace. Judicial estimations also call for speculation as to the appropriate amount of risk premium and the appropriate base rate. While either the prevailing market method or the formula method will involve some speculation, it appears that the market method, at least on vehicles, provides more certainty. Counsel should be able to obtain rate quotes for a similar loan of a given duration and character on a like vehicle.

**3.** *In re Briscoe Enterprises, Ltd., supra,* 994 F.2d 1160, involved calculation of an interest rate in a Chapter 11 on a single asset low income apartment project. Such a secured asset normally would have more interest rate variable possibilities than a motor vehicle loan.

**4.** *See Hall,* 993 F.2d at 1131 (Capping the interest rate at the contract rate).

**5.** See 11 U.S.C. § 1129(b)(2)(a)(I) (providing secured creditors with cash payments with a present value of the allowed secured claim in the context of a chapter 11 cramdown); 11 U.S.C. § 1225(a)(5)(B)(ii) (providing for present value in a chapter 12 plan).

factor in the "appropriate risk."[6] *Id.* at 1160 n. 47. Both conclusions suggest that courts should not employ a method which focuses on the creditor's cost of borrowing, but rather, a court should consider what a creditor would earn on a loan of similar risk.

■ In a different context, the Fifth Circuit has also employed reasoning relevant to this issue. *Assoc. Commercial Corp. v. Rash (Matter of Rash),* 31 F.3d 325 (5th Cir.1994). *Rash* addressed the valuation of collateral for the purposes of arriving at the amount of an allowed secured claim under § 506. *Rash* adopted the "replacement model" approach and valued the lien based on the retail, rather than wholesale, value of the collateral. *Id.* at 329. The court acknowledged that the lien's value related not only to the property's resale value, but also to "the value associated with the right to receive the stream of payments that the lien secures." *Id.* at 330. The court continued:

> The stream of payments in which the creditor has a security interest will be greater in nominal value than the value of the collateral alone because it *includes the opportunity cost to [the creditor] of being forced to continue to tie up money in a loan with [the debtor], rather than being able to lend this money to someone else.* The loss to the creditor is not just the inability to foreclose and receive the value of the collateral, but includes the inability to foreclose and then re-lend the money to someone else.

*Id.* (Emphasis supplied). This court follows the *Rash* rationale by determining the pres-

ent value of a creditor's allowed secured claim with a discount rate that compensates the creditor for lost opportunity costs. The appropriate rate should not approximate the creditor's borrowing costs, but rather, it should approximate the creditor's potential lending returns. As *Rash* reiterated, "what is deemed "profit" is actually the opportunity cost of keeping [the creditor's] money tied up in [the debtor's] loan and the normal return on capital, without which the loan will not be made." *Id.* at 331.

■ This court's opinion appears to conflict with *In re Collins,* 167 B.R. 842 (Bankr. E.D.Tex.1994) also. *See also,* 5 Collier on Bankruptcy ¶ 1325.06 (15th ed. 1994). *Collins* found that the discount rate should not incorporate a rate of return because § 1325, like adequate protection payments under § 362(d), only "serve[s] to protect the status quo." 167 B.R. at 845. Because the Supreme Court would not allow creditors to recover lost opportunity costs in their adequate protection payments under § 362(d)(1), the court found that lost profit should not factor into the discount rate under § 1325. *Id.* at 845–846 *relying on United Savings Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). However, adequate protection payments and the § 1325 discount rate differ in purpose. Adequate protection seeks to protect a creditor from an decline in the value of its collateral,[7] while § 1325(a)(5)(B)(ii) seeks to provide the creditor with the present value of its allowed claim. Therefore, this court declines to follow *Collins.*

> "When adequate protection is required under section 362 ..., such adequate protection may be provided by—(1) requiring the trustee to make a cash payment or periodic cash payments to [the secured creditor], to the extent that the stay under section 362 of this title ... results in a decrease in the value of [the creditor's] interest in such property."
> *See also, Timbers,* 484 U.S. at 370, 108 S.Ct. at 630. ("If the [collateral] in this case had been declining in value petitioner would have been entitled, under § 362(d)(1), to cash payments or additional security in the amount of the decline, as § 361 describes.")

---

**6.** The court also examined the Treasury rate adjusted for a risk premium in order to assess the appropriateness of the contract rate. The court found that a 50% risk premium added to the "risk-free" return rate of the Treasury bills did not render the contract rate excessive. *In re Briscoe Enterprises, Ltd., supra,* 994 F.2d at 1169. The Court noted that the risk premium compared to the risk premium on junk bonds and found that a junk bond premium did not clearly exceed the proper plan risk premium. *Id.* By comparing the risk premium to the plan risk, the Court impliedly relies on a rate that the creditor would receive for a similar loan in the marketplace, not the creditor's borrowing rate.

**7.** 11 U.S.C. § 361 provides:

■ Collier on Bankruptcy also suggests that courts use a discount rate which reflects the creditor's borrowing rate in a chapter 13 cramdown. 5 Collier on Bankruptcy at 1325–47. Collier suggests that the prevailing market rate will overcompensate the creditor by providing for lost profit. This view of Collier is specifically criticized by *Epstein, supra,* § 9–10 at 642, for many of the reasons mentioned above. As discussed above, this court will adopt the reasoning of the Third and Fourth Circuits rather than follow those Collier recommendations. Further, Collier promotes the use of a prevailing market rate for an almost identical provision under chapter 11. 5 Collier on Bankruptcy ¶ 1129.03 at 1129–99, 1129–101 (dealing with § 1129(b)(2)). There is no significant reason to differentiate between § 1129 and § 1325.[8] Both provisions seek to compensate the creditor for the time value of its money because the creditor must accept deferred payments in place of up front compensation.

■ Finally, interest rates are to be determined as of the plan's effective date. As stated earlier, § 1325(a)(5)(B)(ii) requires the value of plan payments, *as of the effective date of the plan,* to equal the allowed secured claim. This language clearly contemplates a determination of the present value of plan payments as of the plan's effective date, which is usually the confirmation date.

Judgment will be entered in accordance with the foregoing opinion.

---

8. *In the Matter of Richards,* 106 B.R. 762, 763 n. 2 (Bankr.M.D.Ga.1989); *In re Southern States, supra,* 709 F.2d at 652; *In re Collins, supra,* 167 B.R. at 845 n. 2; *In re Hudock,* 124 B.R. 532, 533 n. 2 (Bankr.N.D.Ill.1991); *Epstein, supra,* § 9–6 at 627.